## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

FERNANDEZ MARTINEZ and SHAWNEE
BARRETT, on behalf of themselves and all
others similarly situated,

        Plaintiffs,

        v.                              Civ. No. 20-1052 SCY/LF

FEDEX GROUND PACKAGE SYSTEM,
INC., a Delaware corporation,

        Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>
## <u>DENYING CLASS CERTIFICATION</u>

Plaintiffs Fernandez Martinez and Shawnee Barrett bring a putative class action suit

against Defendant FedEx Ground Package System, Inc., alleging violations of the New Mexico

Minimum Wage Act ("NMMWA"). A central issue in the case is whether Defendant

"employed" drivers like Plaintiffs, jointly and in addition to Plaintiffs' undisputed employers

(companies contracting with Defendant referred to as "independent service providers"). Plaintiffs

move to certify the class under Federal Rule of Civil Procedure 23(b)(3), or alternatively, to

certify an issue class under Rule 23(c)(4) pertaining to joint employment. Because Plaintiffs do

not meet their burden of demonstrating that common issues predominate over individualized

issues and that the class is ascertainable through administratively feasible means, the Court

denies the request to certify this lawsuit as a class action. Similarly, because Plaintiffs do not

meet their burden to demonstrate that the issue class is ascertainable through administratively

feasible means, that the joint-employment issue can be decided by evidence common to the class,

or that a class action is the superior method for deciding the joint-employment issue, the Court

denies Plaintiffs' alternative request to certify an issue class.

## BACKGROUND

Plaintiff Fernandez Martinez filed this complaint in federal court on October 12, 2020. Doc. 1. The complaint alleges that Defendant contracts with other companies, called independent service providers ("ISPs"), who directly employed Plaintiff Martinez and a class of similarly situated drivers to make "last mile" package pickups and deliveries for Defendant in New Mexico. The complaint contends that, despite the existence of these ISPs, Defendant is a statutory employer of the drivers under New Mexico law. The complaint alleges that the putative class members were paid by the day, rather than by the hour or by package delivered, and regularly worked in excess of 40 hours per week with no premium payments for overtime hours, all in violation of the NMMWA.

Defendant moved to dismiss the complaint, arguing that payment of a "day rate" falls within an exception to the NMMWA for "fixed rate schedules." The Court denied that motion, finding that "fixed rate schedules," as that term is used in the Act, does not encompass the concept of a day rate. Doc. 24. The parties conducted discovery from May 2021 through February 2022. Docs. 30 & 50. Defendant filed a motion for summary judgment arguing that: (1) Plaintiff Martinez cannot pursue a claim under New Mexico law for work performed in another state and the undisputed evidence confirms that Plaintiff Martinez did not work more than 40 hours a week in New Mexico; and (2) Plaintiff Martinez was assigned "flat-rate hours" to different delivery routes based on each route's difficulty and volume, and so qualified for the "flat rate" exemption under the NMMWA. In response, Plaintiff Martinez moved to amend the complaint to add a second Plaintiff and named class representative, Shawnee Barrett, whose driving work was performed entirely in New Mexico.

The Court granted the motion to amend to add Plaintiff Barrett. Doc. 71. The Court also denied Defendant's motion for summary judgment, rejecting the argument that, as a matter of law, the NMMWA categorically cannot apply to hours a New Mexico resident works outside of New Mexico during his workday, when the resident works for a New Mexico company and starts and finishes his work each day in New Mexico. Doc. 74 at 5-6. The Court also rejected Defendant's second "flat rate" argument, finding that where the number of packages to be delivered per-day or per-route greatly varies per paycheck, a driver is not paid per standardized "unit" as would fall within the term "flat rate" in the NMMWA. Doc. 74 at 25. Plaintiffs now move for class certification, seeking to certify a class of:

> All current or former New Mexico FedEx drivers who were paid a day rate
> without overtime compensation.

Doc. 84 at 2-3.[1]

## ANALYSIS

Plaintiffs move to certify the class under Federal Rule of Civil Procedure 23(b)(3), or alternatively to certify an issue class under Rule 23(c)(4). The Court denies Plaintiffs' motion to certify a Rule 23(b)(3) class because common issues do not predominate over individualized issues and because the class cannot be ascertained through an administratively feasible method. The Court also denies Plaintiffs' motion to certify an issue class (related to whether Defendant jointly employed Plaintiffs) because the class is not readily ascertainable, and the joint-employment issue cannot be decided by evidence common to all class members. In addition, the Court denies the motion to certify an issue class because proceeding as a class is not the superior method of administering the dispute between Defendant, the named Plaintiffs, and putative class

---

[1] The native page numbering in the parties' briefs differs from the CM ECF page numbering in the header. Throughout, the Court's citations are to the CM ECF page numbering.

members. Resolution of the joint-employment issue would not sufficiently advance litigation of the individual claims—even after engaging in additional discovery to identify class members,[2] preparing class notices, sending out those notices, providing putative class members an opportunity to opt-out, and resolving the certified issue at trial, numerous legal and factual issues would remain before liability and damages could be determined through individual trials. Because the issue of joint employment is central to Plaintiffs' motion under both Rule 23(b)(3) and Rule 23(c)(4), the Court begins its analysis by setting forth the competing joint-employment tests the parties propose.

## I.        Proposed Joint Employment Tests

The parties agree that, for Plaintiffs to prevail on their argument that Defendant did not pay them overtime owed, they must first establish that Defendant employed them. Doc. 84 at 4; Doc. 98 at 22. The NMMWA defines "employer" to include "any individual, partnership, association, corporation, business trust, legal representative or organized group of persons employing one or more employees at any one time, acting directly or indirectly in the interest of an employer in relation to an employee." NMSA § 50-4-21(B). Employ "includes suffer or permit to work." *Id.* § 50-4-21(A). The parties do not dispute that these definitions must be used to determine if there is employment. Nor do they dispute that the ISPs with whom Defendant contracted employed the drivers at issue. They disagree, however, as to whether Defendant acted as a joint employer and as to which joint-employment test the Court should use to resolve this disagreement.

Plaintiffs argue that the Court should look to the New Mexico Department of Workforce

---

[2] Plaintiffs' counsel at the August 31, 2023 hearing acknowledged that additional discovery would be needed to ascertain the identities of the ISP drivers who were paid a day rate. Doc. 121 at 153.

Solutions' Labor Relations Division's Investigations Manual for the factors applicable in

determining whether an entity is an employer. Doc. 84 at 20-21; *see* New Mexico Department Of

Workforce Solutions, Investigations Manual Labor Relations Division (2019),

https://www.dws.state.nm.us/Portals/0/DM/LaborRelations/LRD_Manual_Final_11-14-19.pdf

("Investigations Manual"). The Investigations Manual acknowledges that there is no New

Mexico case law on the topic but predicts that New Mexico courts would find federal FLSA

guidance on the topic persuasive "because the definition of 'employ' is almost identical in both

New Mexico and federal law." *Id.* at 64-65. "Absent specific New Mexico authority on the

vertical joint employment scenario, and to ensure a robust policy with respect to this somewhat

complex issue, you should look to seven economic realities factors to determine who the vertical

joint employer is." *Id.* at 72. The seven factors are:

> 1) directing, controlling, or supervising the work performed;
>
> 2) controlling employment conditions;
>
> 3) permanency and duration of relationship;
>
> 4) repetitive and rote nature of work;
>
> 5) integral to business;
>
> 6) work performed on premises; and
>
> 7) performing administrative functions commonly performed by employers.

*Id.* at 72-74.

Instead of using the test Plaintiffs propose, Defendant contends the appropriate test is a

five-factor test from *Knitter v. Corvias Military Living, LLC*, 758 F.3d 1214, 1226 (10th Cir.

2014), a Title VII joint-employment case. These factors are:

> (1) the most important factor, the right to terminate the employment relationship;
>
> (2) the ability to promulgate work rules and assignments;

(3) the ability to set conditions of employment, including compensation, benefits, and hours;

(4) day-to-day supervision of employees, including employee discipline; and

(5) control of employee records, including payroll, insurance, taxes and the like.

*See* Doc. 98 at 23-24.

The Court, however, need not decide at this time which joint-employment test to use. As set forth more fully below, the Court could not apply either test without engaging in individual factfinding related to each ISP; that is, neither test can be adequately applied through the use of common evidence. Because it would not be efficient to apply either test as a class, resolution of Plaintiffs' motion does not turn on which test is used.

## II.    Class Certification

Federal Rule of Civil Procedure 23(a) states four threshold requirements applicable to all class actions: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997). "In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Id.* Plaintiffs here seek certification under Rule 23(b)(3). Doc. 84 at 17. "To qualify for certification under Rule 23(b)(3), a class must meet two requirements beyond the Rule 23(a) prerequisites: Common questions must predominate over any questions affecting only individual members; and class resolution must be superior to other available methods for the fair and efficient adjudication of the controversy." *Amchem Prods., Inc.*, 521 U.S. at 615 (internal quotation marks omitted).

"Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently

numerous parties, common questions of law or fact, etc." *Id.* But "[i]t is not necessary that all of the elements of the claim entail questions of fact and law that are common to the class, nor that the answers to those common questions be dispositive." *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014). "Put differently, the predominance prong asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id.* (internal quotation marks omitted). "For the purposes of class certification, [the court's] primary function is to ensure that the requirements of Rule 23 are satisfied, not to make a determination on the merits of the putative class's claims." *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1087-88 (10th Cir. 2014).

Plaintiffs contend that common proof will determine whether Defendant is the statutory employer of the drivers. Doc. 84 at 19-28. Even if true, however, the ability to resolve one issue alone through common proof does not mean that, looking at the case as a whole, "questions of law or fact common to class members predominate over any questions affecting only individual class members." Fed. R. Civ. P. 23(b)(3).[3] When it comes to Rule 23(b)(3) class certification, "Rule 23(a)(2)'s 'commonality' requirement is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions." *Amchem Prods., Inc.*, 521 U.S. at 609. This Court thus follows the Tenth Circuit's lead in focusing on predominance, rather than Rule 23(a) commonality, when Rule 23(b)(3) is in play. *See, e.g.*, *Brayman v. KeyPoint Gov't Sols., Inc*., 83 F.4th 823, 838 (10th Cir. 2023).

---

[3] Later in this Opinion, the Court addresses Plaintiffs' alternative request to certify an issue class under Rule 23(c)(4).

Questions of fact common to class members do not predominate over questions that must be resolved on an individual basis. Regardless of whether Defendant jointly employed the drivers, Plaintiffs have failed to meet their burden to show they can present common evidence rather than individualized evidence to establish drivers worked more than forty hours per week (for liability purposes), how many hours over forty drivers worked (for damages purposes), and how drivers were paid (to show they were not paid overtime).

Additionally, the Court agrees with Defendant that under Plaintiffs' proposed class definition, the class is not ascertainable in an administratively feasible manner. That is because Plaintiffs propose a class of New Mexico ISP drivers who were paid a "day rate." The evidence in this case shows it is necessary to interview each driver and examine payroll records for each driver to determine whether and during what periods they were paid a day rate. Doing this for every driver who worked for a New Mexico ISP is not administratively feasible and Plaintiffs propose no reliable, administratively feasible, alternative method for determining on a class basis which drivers were paid a day rate and when they were paid such a rate.

Because Plaintiffs cannot establish predominance under Rule 23(b)(3), and because the proposed class membership is not readily ascertainable, the Court need not consider the Rule 23(a) issues of numerosity, commonality, typicality, and representativeness.

A.    Predominance

The predominance inquiry begins "with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co*., 563 U.S. 804, 809 (2011). In proving these elements, "[t]he predominance inquiry 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting 2 W. Rubenstein, Newberg on Class Actions § 4:49, at pp. 195-96 (5th ed. 2012)). "An individual

question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof.'" *Id.* (alterations omitted) (quoting Newberg on Class Actions § 4:50, pp. 196-97). "Courts conduct a two-step analysis. First, for every issue related to the claim, the court must characterize it as common or individual. . . . The court must then weigh the issues to determine whether the common issues predominate." *Brayman*, 83 F.4th at 838; *Naylor Farms, Inc. v. Chaparral Energy, LLC*, 923 F.3d 779, 789 (10th Cir. 2019). In considering these steps, a "rigorous" predominance analysis requires a district court to ascertain the facts required to prove the plaintiffs' claims and then determine whether the plaintiffs have shown that they could establish those facts through common evidence. *Brayman*, 83 F.4th at 839.

Applying this guidance, for Plaintiffs to prevail they must show that (1) their employment is governed by New Mexico law; (2) Defendant employed them; (3) they worked overtime in excess of 40 hours a week; and (5) they were not paid a premium rate for the hours over 40 each week. Defendant argues that individualized evidence will be required to prove whether the putative class members worked over 40 per week; if they did, how many hours over 40 per week they worked; which drivers were paid a "day rate" in a manner that did not compensate them for overtime; whether the drivers are otherwise exempt from New Mexico's overtime requirement (such as managers who occasionally filled in as drivers); and whether any drivers worked out-of-state hours such that New Mexico law might not apply to them. Doc. 98 at 35-38. Plaintiffs' predominance argument focuses on only one of these issues—whether Defendant was a joint employer. Rather than attempting to establish predominance for the remaining elements Plaintiffs must prove, Plaintiffs argue that it need not demonstrate predominance regarding these

remaining elements. Specifically, Plaintiffs assert that "[t]he overarching question of whether FedEx is a statutory employer is a predominant question impacting the entire class" and argue that this alone is sufficient to establish predominance. Doc. 84 at 30. Plaintiffs' entire predominance argument for the remaining elements consists of the following sentence: "In addition, the NMMWA claim will also be resolved based on common evidence." *Id.* at 31.

It appears that Plaintiffs attempt to overcome the lack of analysis on non-joint-employment elements by arguing that, because the joint-employment issue can be resolved through common evidence, Rule 23(b)(3)'s predominance requirement is satisfied even if common evidence does not exist to establish whether drivers worked over 40 hours per week, how many hours over 40 they worked, whether they were paid for the hours over forty that they worked, or whether their employment is governed by New Mexico law. Plaintiffs argue, "the Tenth Circuit has held that, '[c]ritically, so long as at least one common issue predominates, a plaintiff can satisfy Rule 23(b)(3).'" Doc. 84 at 30 (quoting *Naylor Farms,* 923 F.3d at 789). "Thus, 'it is not necessary that all of the elements of the claims entail questions of fact and law that are common to the class nor, that the answers to those common questions be dispositive.'" Doc. 84 at 30 (quoting *Felps v. Mewbourne Oil Co., Inc*., 336 F.R.D. 664, 675 (D.N.M. 2020)). Plaintiffs' focus on what *is not* always necessary to establish predominance, however, fails to address what *is* always necessary. Common questions of law or fact are necessary but insufficient to establish predominance. To establish predominance, common questions of law or fact must "predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).

As *Naylor Farms* explained, the first step in a predominance inquiry is to "characterize the issues in the case as common or not." 923 F.3d at 789 (internal quotation marks omitted). But

then there is a second step: courts must "weigh which issues predominate." *Id.* Thus, the existence of a common issue cannot satisfy Rule 23(b)(3) unless that issue is so significant that it predominates over questions affecting individual members. "Rule 23(b)(3)'s predominance criterion is far more demanding than Rule 23(a)'s commonality requirement." *Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*, 725 F.3d 1213, 1220 (10th Cir. 2013).

In *Naylor Farms*, the Tenth Circuit found that the district court correctly held that whether the defendant breached its contracts with class members was a common issue susceptible to classwide resolution. 923 F.3d at 791-98. After affirming this finding, the Tenth Circuit had no occasion to weigh the breach of contract issue against other issues related to liability and not susceptible to classwide resolution, as defendant's remaining predominance argument related to damages. *Id.* at 798. The Tenth Circuit pointed out that "material differences in damages determinations will only destroy predominance if those individualized issues will overwhelm questions common to the class." *Id.* (internal quotation marks omitted). In that case, the plaintiff "provided evidence that its expert can determine damages on a class wide basis through use of a model, thus obviating the need for individualized evidence." *Id.* (citing *Tyson Foods, Inc.*, 577 U.S. 442). "And [the defendant] fails to explain why that model is inaccurate or unworkable." *Id.*

Plaintiffs' motion in this case fails to engage in weighing or to offer an analysis of why the common issue of employment prevails over the individualized issues of hours worked, geographic variances (i.e., whether some drivers worked out-of-state during part of the day), and rate of pay. Nor does Plaintiffs' motion demonstrate that individualized issues will not overwhelm common questions. Instead, Plaintiffs' motion simply assumes that the joint-employment issue predominates; it fails to explain how or what common evidence can be used to

resolve the remaining factual and legal issues and fails to show that these issues are not as important as, or more important than, joint employment. What Plaintiffs offer is insufficient to demonstrate that certification is appropriate under Rule 23(b)(3).

Not having indicated in briefing how common evidence could be used to resolve issues other than joint employment, Plaintiffs at oral argument asserted that they could establish predominance through representative evidence of how many hours drivers worked. *E.g.*, Doc. 121 at 17-19. But "[i]ssues raised for the first time at oral argument are considered waived." *Fed. Ins. Co. v. Tri-State Ins. Co*., 157 F.3d 800, 805 (10th Cir. 1998). More importantly, even if the Court could consider Plaintiffs' representative evidence argument, Plaintiffs did not produce any representative evidence or even specifically describe what representative evidence would look like.

The Court agrees that, as a matter of law, plaintiffs seeking class certification can sometimes use representative evidence to demonstrate predominance. Here, however, Plaintiffs' failure to produce, or even specifically describe, any such representative evidence is fatal to their argument that they have demonstrated predominance by a preponderance of the evidence. Because Plaintiffs failed to meet their burden of proving that they can present representative evidence rather than individualized evidence to establish drivers worked more than forty hours per week, how many hours over forty drivers worked, and how many hours drivers worked over forty hours without receiving overtime pay, their motion for class certification fails.

Indeed, the Supreme Court's decision in *Tyson Foods* mandates this result. The putative class in *Tyson* consisted of employees at Tyson Foods' pork processing plant where hogs were slaughtered, trimmed, and prepared for shipment. 577 U.S. at 447. "Grueling and dangerous, the work requires employees to wear certain protective gear. The exact composition of the gear

depends on the tasks a worker performs on a given day." *Id.* Tyson did not record the time each

employee spent donning and doffing this protective gear. *Id.* The employees filed suit, arguing

that Tyson was improperly compensating them under the FLSA, which "requires employers to

pay employees for activities 'integral and indispensable' to their regular work, even if those

activities do not occur at the employee's workstation." *Id.* at 447-48 (quoting *Steiner v. Mitchell*,

350 U.S. 247, 249 (1956)). In their complaint, the employees alleged that donning and doffing

protective gear were integral and indispensable to their hazardous work and that Tyson's policy

not to pay for those activities denied them overtime compensation the FLSA required. *Id.* at 448.

Arguing against class certification, Tyson "contended that, because of the variance in

protective gear each employee wore, the employees' claims were not sufficiently similar to be

resolved on a classwide basis." *Id.* at 448. The district court disagreed, certified the class, and

tried the case to a jury along the following plan:

> Since the employees' claims relate only to overtime, each employee had to show
> he or she worked more than 40 hours a week, inclusive of time spent donning and
> doffing, in order to recover. As a result of Tyson's failure to keep records of
> donning and doffing time, however, the employees were forced to rely on what
> the parties describe as "representative evidence." This evidence included
> employee testimony, video recordings of donning and doffing at the plant, and,
> most important, a study performed by an industrial relations expert, Dr. Kenneth
> Mericle. Mericle conducted 744 videotaped observations and analyzed how long
> various donning and doffing activities took. He then averaged the time taken in
> the observations to produce an estimate of 18 minutes a day for the cut and retrim
> departments and 21.25 minutes for the kill department.
>
> Although it had not kept records for time spent donning and doffing, Tyson had
> information regarding each employee's gang-time [time spent at work stations]
> and K-code time [time compensated for donning and doffing]. Using this data, the
> employees' other expert, Dr. Liesl Fox, was able to estimate the amount of
> uncompensated work each employee did by adding Mericle's estimated average
> donning and doffing time to the gang-time each employee worked and then
> subtracting any K-code time. For example, if an employee in the kill department
> had worked 39.125 hours of gang-time in a 6–day workweek and had been paid
> an hour of K-code time, the estimated number of compensable hours the
> employee worked would be: 39.125 (individual number of gang-time hours
> worked) + 2.125 (the average donning and doffing hours for a 6–day week, based

on Mericle's estimated average of 21.25 minutes a day) - 1 (K-code hours) = 40.25. That would mean the employee was being undercompensated by a quarter of an hour of overtime a week, in violation of the FLSA. On the other hand, if the employee's records showed only 38 hours of gang-time and an hour of K-code time, the calculation would be: 38 + 2.125 - 1 = 39.125. Having worked less than 40 hours, that employee would not be entitled to overtime pay and would not have proved an FLSA violation.

Using this methodology, Fox stated that 212 employees did not meet the 40–hour threshold and could not recover. The remaining class members, Fox maintained, had potentially been undercompensated to some degree.

*Id.* at 450-51.

Tyson Foods challenged the certification decision in the Supreme Court. It did not "dispute that there are important questions common to all class members, the most significant of which is whether time spent donning and doffing the required protective gear is compensable work under the FLSA." *Id.* at 455. But, similar to Defendant's argument in the present case, it argued that the "necessarily person-specific inquiries into individual work time" and whether the donning and doffing amounted to more than 40 hours in a given week for each employee "predominate[d] over the common questions raised by respondents' claims, making class certification improper." *Id.*

The Supreme Court held that predominance was not a barrier because the individual inquiries Tyson contended defeated class certification were properly resolved by means of representative evidence in the trial court. "Whether and when statistical evidence can be used to establish classwide liability will depend on the purpose for which the evidence is being introduced and on the elements of the underlying cause of action." *Id.* at 455 (internal quotation marks omitted). "One way for respondents to show, then, that the sample relied upon here is a permissible method of proving classwide liability is by showing that each class member could have relied on that sample to establish liability if he or she had brought an individual action. If the sample could have sustained a reasonable jury finding as to hours worked in each employee's

individual action, that sample is a permissible means of establishing the employees' hours

worked in a class action." *Id.*

The Court relied on its prior decision in *Anderson v. Mt. Clemens*, 328 U.S. 680 (1946),

to explain "why Mericle's sample was permissible in the circumstances of this case":

> when employers violate their statutory duty to keep proper records, and
> employees thereby have no way to establish the time spent doing uncompensated
> work, the remedial nature of the FLSA and the great public policy which it
> embodies militate against making the burden of proving uncompensated work "an
> impossible hurdle for the employee." Instead of punishing the employee by
> denying him any recovery on the ground that he is unable to prove the precise
> extent of uncompensated work, the Court held an employee has carried out his
> burden if he proves that he has in fact performed work for which he was
> improperly compensated and if he produces sufficient evidence to show the
> amount and extent of that work as a matter of just and reasonable inference.
> Under these circumstances, the burden then shifts to the employer to come
> forward with evidence of the precise amount of work performed or with evidence
> to negative the reasonableness of the inference to be drawn from the employee's
> evidence.

*Tyson Foods*, 577 U.S. at 456 (cleaned up).

*Tyson* thus affirmed the district court, finding that "[r]eliance on Mericle's study did not

deprive petitioner of its ability to litigate individual defenses." *Id.* at 457. "Since there were no

alternative means for the employees to establish their hours worked, petitioner's primary defense

was to show that Mericle's study was unrepresentative or inaccurate. That defense is itself

common to the claims made by all class members." *Id.* But it also cautioned that, "This is not to

say that all inferences drawn from representative evidence in an FLSA case are 'just and

reasonable.'" *Id.* at 459 (quoting *Mt. Clemens*, 328 U.S. at 687). "Representative evidence that is

statistically inadequate or based on implausible assumptions could not lead to a fair or accurate

estimate of the uncompensated hours an employee has worked." *Id.* Tyson Foods did not raise

such a challenge in that case, so the Supreme Court did not consider any such objection.

At oral argument in this case, Plaintiffs contended that they can proceed in this case on

the basis of representative evidence, as did the plaintiffs in *Tyson Foods*. *E.g.*, Doc. 121 at 17-23. But unlike the plaintiffs in *Tyson Foods*, the Plaintiffs here did not offer an expert or explain how they would try this case with representative testimony. This leaves Defendant and the Court unable to evaluate whether, under the standard in *Tyson Foods*, "each class member could have relied on that sample to establish liability"; or whether the inferences Plaintiffs plan to request that the Court draw are "just and reasonable", i.e., based on plausible, fair, and accurate assumptions. *Cf.* 577 U.S. at 459. Clearly, this Court cannot engage in such an analysis when there is no proposed method at all before it.

Plaintiffs stated at oral argument that they will find an expert to come up with a method after class certification. Doc. 121 at 16. But the Court agrees with Defendant: the time for Plaintiffs to present evidence in support of their class certification motion was when they moved for class certification. "A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Notably, in *Comcast*, the Supreme Court reversed where the court of appeals affirmed class certification while simultaneously holding that it had "not reached the stage of determining on the merits whether the methodology is a just and reasonable inference or speculative." *Comcast Corp. v. Behrend*, 569 U.S. 27, 32 (2013). The Court rejected the proposition that "at the class-certification stage *any* method of measurement is acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be." *Id.* at 36. "Such a proposition would reduce Rule 23(b)(3)'s predominance requirement to a nullity." *Id.*

The clear implication of the Supreme Court's holding is that class certification *is* the stage for determining whether the methodology is "just and reasonable." *Id.* at 35. Several other

courts have reached the same conclusion. *See Castillo v. Bank of Am., NA*, 980 F.3d 723, 732 (9th Cir. 2020) (denying class certification on predominance grounds and finding "[t]his case differs from *Tyson Foods* because Castillo cannot provide a common method of proof to establish BOA's classwide liability" or "representative evidence of proving classwide liability"); *In re Petrobras Sec*., 862 F.3d 250, 272 (2d Cir. 2017) (no predominance where the "transaction-specific facts are not obviously susceptible to class-wide proof, nor did Plaintiffs suggest a form of representative proof that would answer the question . . . for individual class members" (cleaned up)); *Gonzalez v. Fam. Dollar Stores, Inc*., No. 03cv535 JH/LFG, 2005 WL 8163793, at *5 (D.N.M. June 21, 2005) (denying certification where "Plaintiffs have failed to elaborate on the specifics of how they would implement this method of [representative] proof"). The Tenth Circuit's recently published decision in *Brayman* also indicates, not surprisingly, that any methodology proposed to justify class certification must be presented at class certification. *Brayman*, 83 F.4th at 839 ("Perhaps, as in *Tyson Foods*, Plaintiffs can show this to be a common issue through expert testimony, statistical data, or representative evidence; but nothing of that nature in the record has been brought to our attention."); *id.* at 841 ("Plaintiffs did not present expert testimony or statistical evidence" to show that the interrogatory answers complaining about being forced to work uncompensated overtime due to an "impossible workload" were representative of the entire class).

After oral argument (which was held before the Tenth Circuit decided *Brayman*), Plaintiffs filed a supplement contending that they *have already* presented a "just and reasonable" method: "Plaintiffs have clearly demonstrated that FedEx maintains detailed 'scanner data' that records every class member's 'on-duty' time. Moreover, sworn declarations confirm that class

members can estimate work hours based on their personal recollections." Doc. 123.[4] Rather than presenting a currently cognizable methodology, however, Plaintiffs at this point are only presenting an idea of what they hope to later present. As Plaintiffs acknowledged at oral argument, for the scanner data to be useful, an expert must evaluate it and present testimony on the basis of which the Court could "award[] damages [to class members] based on averages." Doc. 121 at 16-18. But Plaintiffs currently do not have such an expert.[5] And, as for the collected sworn declarations currently in the record—less than ten—Plaintiffs have not demonstrated that these samples constitute statistically reliable representative evidence—as opposed to biased samples, hand-picked through one-sided criteria favorable to Plaintiffs. *E.g.*, *Brayman*, 83 F.4th at 840-41 (noting that the lack of "expert testimony or statistical evidence" gives rise to questions such as, "Are the [plaintiffs who swore out the interrogatory answers] simply the least-productive employees, who work uncompensated overtime to avoid being demoted or discharged?").

That is, the Court lacks sufficient information to determine whether such representative evidence is "just and reasonable." And Plaintiffs cannot satisfy this "just and reasonable" standard by claiming they will come up with evidence to prove common questions predominate over individual questions at some later date. Under Tenth Circuit precedent, "it is not the

---

[4] This does not appear to be consistent with Plaintiffs' statement at oral argument that they will disclose an expert to fashion a method of presenting representative evidence after class certification. Doc. 121 at 16.

[5] Plaintiffs explained at oral argument that Defendant refused to produce the scanner data on a classwide basis. Doc. 121 at 16. Because Plaintiffs never filed a motion to compel such information, the Court did not, and does not now, consider whether such data would be discoverable pre-certification. Instead, the Court simply observes that Plaintiffs have not demonstrated, through expert testimony or otherwise, that, without individual inquiry, scanner data can provide a reliable estimate of hours worked.

defendant who bears the burden of showing that the proposed class does not comply with Rule 23, but rather the plaintiff who bears the burden of showing that the class does comply with Rule 23.'" *Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*, 725 F.3d 1213, 1218 (10th Cir. 2013) (quoting *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 321 (4th Cir. 2006)).

To get around this burden of proof, Plaintiffs argue that, under the *Mt. Clemens* presumption, this burden of proof should shift away from class members and onto Defendant. They argue, as a joint employer, Defendant "violate[ed] [its] statutory duty to keep proper records." Doc. 84 at 32; Doc. 100 at 10-11. Whether Defendant is a joint employer, however, is a matter in dispute, not a fact that has been established. Not having established that Defendant employed the drivers in question, Plaintiffs have not established that Defendant was statutorily obligated to keep proper records of hours and pay.

Plaintiffs' citation to *Hargrove v. Sleepy's LLC*—a case Plaintiffs repeatedly cite and exhort the Court to follow, *e.g.*, Doc. 121 at 138—is unavailing. Unlike in the present case, the plaintiffs in *Hargrove* had filed, and prevailed on, a motion for partial summary judgment such that the *Hargrove* defendant had been established as an employer *before* the district court dealt with the issue of representative evidence. 974 F.3d 467, 473-74 (3d Cir. 2020) ("[T]he parties filed partial cross-motions for summary judgment on whether the named plaintiffs were employees or independent contractors. The District Court held that the three named plaintiffs were employees of Sleepy's. . . . Appellants thereafter filed their first motion for class certification." (alterations omitted)). Similarly, the Supreme Court's application of the *Mt. Clemens* presumption in *Tyson* was premised in part on the undisputed fact that *Tyson* employed the putative class members. *Tyson*, 577 U.S. at 447 ("Respondents are employees at petitioner Tyson Foods' pork processing plant in Storm Lake, Iowa."). The Court declines to apply a

presumption against Defendant in this case based on a law that applies to "employers" without first finding that Defendant was Plaintiffs' employer. Without this presumption, it is Plaintiffs' burden to demonstrate that questions of fact common to class members predominate over any questions affecting only individual members. Given the significant individual questions related to hours worked, geographic variances, and rate of pay, Plaintiffs have failed to carry this burden.

      B.    <u>Ascertainability</u>

"Ascertainability" is not one of the class certification requirements enumerated in Rule 23. Nonetheless, every circuit to consider the issue requires that the proponent of class certification show that the class is, or will be, ascertainable by objective criteria. *See Smith v. LifeVantage Corp.*, 341 F.R.D. 82, 91-93 (D. Utah 2022) (collecting cases). There is a split among the circuits as to the precise criteria for evaluating ascertainability. *See id.* (collecting cases). In the First, Third, Fourth, and Sixth Circuits, a class is ascertainable if it is defined with respect to objective criteria and is administratively feasible. The Second, Fifth, Eighth, Ninth, and Eleventh Circuits reject the administratively feasible inquiry and require only that the class be defined by adequate objective criteria. *See generally id.*

The Tenth Circuit has not discussed this split in a published decision. It has, however, affirmed under an abuse of discretion standard a district court's decision to use the "administratively feasible" test. *Davoll v. Webb*, 194 F.3d 1116, 1146 (10th Cir. 1999). Further, in a recent unpublished decision, the Tenth Circuit engaged in an extensive discussion on the topic of this circuit split, and affirmed the use of the administrative feasibility test. *Evans v.*

*Brigham Young Univ.*, No. 22-4050, 2023 WL 3262012, at *5 (10th Cir. May 5, 2023)[6] ("A court may 'properly look below the surface of a class definition to determine whether the actual process of ascertaining class membership will necessitate delving into individualized or subjective determinations.'" (quoting 2 Joseph M. McLaughlin, McLaughlin on Class Actions § 4:2)).

The Court exercises its discretion, recognized in *Davoll*, to evaluate whether it is administratively feasible to ascertain the class. As the Third Circuit has explained, imposing this administrative feasibility requirement to ensure that a class is ascertainable serves important public policy objectives. "[I]t eliminates serious administrative burdens that are incongruous with the efficiencies expected in a class action by insisting on the easy identification of class members." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012) (internal quotation marks omitted). "[I]t protects absent class members by facilitating the 'best notice practicable' under Rule 23(c)(2) in a Rule 23(b)(3) action." *Id.* (citing Manual for Complex Litigation, § 21.222 (4th ed. 2004)). Finally, "it protects defendants by ensuring that those persons who will be bound by the final judgment are clearly identifiable." *Id.*

Indeed, Plaintiffs do not take issue with application of this standard. Doc. 84 at 32 (citing Third and Sixth Circuit cases on ascertainability). Rather, Plaintiffs argue that, although a class has to be ascertain*able* at the time of certification, class membership does not have to be ascertain*ed* at that time. Doc. 84 at 32 (citing *Byrd v. Aaron's Inc*., 784 F.3d 154, 164 (3d Cir. 2015)). The Court agrees that a class need not be ascertained at the time of certification. But, at the time of certification, Plaintiffs must prove the class will be ascertainable through a "reliable

---

[6] The Court cites unpublished Tenth Circuit cases for their persuasive value. *See* 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").

and administratively feasible method." *Byrd*, 784 F.3d at 163; *Davoll*, 194 F.3d at 1146. "If class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *Marcus*, 687 F.3d at 593. "[A] party cannot merely provide assurances to the district court that it will later meet Rule 23's requirements. Nor may a party merely propose a method of ascertaining a class without any evidentiary support that the method will be successful." *Byrd*, 784 F.3d at 164.

Here, Plaintiffs define the class as "All current or former New Mexico FedEx drivers who were paid a day rate without overtime compensation." Doc. 84 at 4. Defendant argues that there is no classwide, administratively feasible method to identify every driver who was paid a "day rate without overtime compensation." Doc. 98 at 35-38. Defendant contends the factfinder will be required to look at the pay records of each driver and consider each driver's testimony to determine, during the relevant period, whether they were paid a day rate without overtime. *Id.*

Plaintiffs respond that whether a driver worked overtime is an issue that is ultimately in dispute and that the Court is not required to resolve an ultimate issue *before* certifying the class and issuing notice. Doc. 121 at 154. This is true. But Plaintiffs still bear the burden of articulating an "administratively feasible" method for adjudicating class membership down the road. Plaintiffs contend they will be able to do so by representative evidence, which is common in wage and hour cases. Doc. 121 at 125. But Plaintiffs' contention amounts to a request that the Court simply trust they will come up with a reliable methodology of presenting representative evidence later in the case. For the reasons articulated above (in analyzing predominance), the Court declines to accept on faith Plaintiffs' plan of later coming up with a reliable methodology

to determine who worked overtime and how many unpaid overtime hours those drivers worked.[7]
The time to demonstrate an administratively feasible method for adjudicating class claims is at
the class certification stage.

In addition to needing a reliable methodology to determine which drivers worked
overtime and how much unpaid overtime those drivers worked, Plaintiffs also carry the burden
of demonstrating that it would be administratively feasible for the Court to determine which
drivers were paid a day rate. At oral argument, Plaintiffs acknowledged that it would make sense
for the Court to at least resolve whether a driver received a day rate in order to identify class
members before issuing class notice. Doc. 121 at 154-55. Defendant's evidence, however, shows
that this question cannot be resolved by any method short of combing through the records of
each driver for each ISP during the relevant time period and questioning each driver about the
accuracy of the pay records.

In an attempt to show such individual fact gathering is unnecessary, Plaintiffs point to a
questionnaire one ISP manager completed that indicates the ISP paid its drivers a "day rate."
Doc. 121 at 27. Plaintiffs contend similar questionnaires can be obtained from each ISP and then
used to determine whether the ISP's drivers satisfy the "day rate" requirement in the class
definition. *Id.* at 27-28. But Defendant objected when Plaintiffs requested in discovery similar
forms pertaining to other ISPs. *Id.* at 123. At oral argument, Defendant represented to the Court
that such forms do not exist—the questionnaire Plaintiffs cite is a product of a random audit, not

---

[7] Whether the failure to come up with a reliable methodology to calculate hours worked should
be analyzed under the ascertainability or predominance prong is subject to debate. How this
debate is resolved, however, is irrelevant to the final outcome. Plaintiffs' failure to identify a
common methodology for determining which drivers worked overtime and how much unpaid
overtime those drivers worked is fatal to Plaintiffs' certification request, regardless of which
Rule 23 prong the failure falls under.

Defendant's ordinary compliance practices that apply to every ISP. *Id.* at 71-72. Plaintiffs did not

move to compel this evidence during discovery, so the Court has no way of verifying whether

such questionnaires exist. Nonetheless, it is Plaintiffs' burden to show ascertainability, and

Plaintiffs have not shown that the class is ascertainable based on questionnaires that may or may

not exist for each ISP. Furthermore, as explained further below, the existing evidence

demonstrates that it is highly unlikely that each ISP consistently does or does not pay a day rate

across all its drivers and all relevant pay periods.

Plaintiffs also state that the class is "readily ascertainable based on the testimony of

drivers [and] pay records." Doc. 84 at 32.[8] The first category of evidence Plaintiffs cite—

"testimony of drivers"—appears to be a collection of hearsay statements from the less than ten

sample declarations in the record. Specifically, Plaintiffs collected affidavits from drivers who

worked for various ISPs in New Mexico, and each one states:

> At any point in time, there were [several] other FedEx delivery drivers [at my
> ISP]. Based on conversations I've had with other drivers I know that, like me,
> they were all paid a flat daily rate, regularly worked more than 40 hours each
> week, and did not receive any overtime compensation.

Doc. 84-6 at 3 (Atencio Decl.); *id.* at 5 (Baca Decl.); *id.* at 7 (Chavez Decl.); *id.* at 9 (Harper

Decl.); *id.* at 11 (Ornelas Decl.); *id.* at 13 (Sauerman Decl.); *id.* at 15 (Sleuth Decl.). Defendant

argues that these declarations lack foundational support, as the declarants do not have personal

knowledge of how many hours other drivers worked for the declarant's ISP and how the ISP paid

those other drivers. Doc. 98-4 (summarizing deposition testimony). Deposition testimony from

nearly every declarant indicates that the declarant lacked personal knowledge of how many hours

---

[8] Along with this statement, Plaintiffs propose using "FedEx's scanner data." But this is a
method of ascertaining driver hours, not pay. And, for the reasons stated above, the Court rejects
Plaintiffs' contention that scanner data provides a reliable estimate of drivers' hours.

other drivers worked or what they were paid.[9]

Defendant, of course, make the obvious argument that hearsay is unreliable. To drive this point home, however, Defendant presents specific evidence (in the form of deposition testimony and affidavits) that contradicts the hearsay evidence Plaintiffs present. This evidence indicates (with respect to both driver testimony and pay records—Plaintiffs' second category of evidence), "drivers were paid (1) hourly with overtime, (2) hourly with overtime and performance bonuses, (3) per package or per stop, (4) a flat rate—that might or might not change based on package volume or route difficulty, (5) flat rates with overtime pay, hourly pay, bonuses, or 'extra time' pay, and (6) a combination of flat rate and per-package pay." Doc. 98 at 18. For example:

- 4C Logistics paid a daily rate, but some drivers received holiday pay, salary pay, bonus and Saturday pay. Doc. 98-17 (Atencio Dep. at 106-10).

- Amador Express Inc. paid a day rate, bonuses, vacation and holiday pay, hourly with overtime, per-stop, and per-package pay. Doc. 98-33 (Sleuth Dep. 53-57, 63, 90-91, 94, 117).

- Bella Leo Trucking Inc. paid some drivers a day rate and paid some drivers a salary; paid some drivers a day rate in addition to pay per stop; and paid additional daily compensation to salaried drivers working 6 days in a week. Doc. 98-16 at 3.

- Chavolla Enterprises Corporation paid some drivers weekly and some a day rate; it

---

[9] *See* Doc. 98-9 at 7, 16 (Chavez Dep. at 29:13-22, 78:1-3) (deponent did not ask other drivers if they were paid a day rate and just "assumed" they were); Doc. 98-11 at 7-8 (Ornelas Dep. at 29:4-30:18) (deponent does not know "for a fact" if other drivers were paid salary and just "assumed" they were); Doc. 98-17 at 9 (Atencio Dep. at 46:4-25) (deponent agrees it is fair to say that he does not have knowledge about how many hours any drivers were working on average); Doc. 98-27 at 7, 10-11 (Sauerman Dep. at 35:18-36:18, 53:19-54:21) (deponent has no knowledge of what other drivers in New Mexico were paid; deponent had a conversation with one person about being paid a daily rate but has no knowledge of whether that person received overtime compensation); Doc. 98-33 at 7, 30-31 (Sleuth Dep. at 44:11-20, 140:25-141:4, 144:5-9, 146:14-17) (deponent did not go around asking other drivers how they were paid, and did not have conversations with other drivers besides his father about how many hours per week they were working); Doc. 98-35 at 7-9 (Baca Dep. at 32:11-13, 35:14-19, 36:4-9, 41:13-22) (deponent does not know if other drivers were paid under the same arrangement as him, and had no conversations with other drivers about how much they were paid, how many hours they would work in a given week, or about overtime compensation).

issued one driver pay stubs reflecting hourly pay, but the driver testified that her pay was actually a day rate and did not change by the hours worked in a day. Doc. 98-10 (Barrett Dep. at 123-24); Doc. 98-27 (Sauerman Dep. at 25-26).

- G.T.O, Inc. issued pay stubs reflecting hourly pay and per-stop pay, but the driver testified that she was not paid hourly or per stop. Doc. 98-10 (Barrett Dep. at 131-133).

- Greenline Trucking Inc. paid a day rate plus a bonus for extra stops during Christmas and performance bonuses, Doc. 98-35 (Baca Dep. 9, 26, 39-40, 58:6-20); and weekly pay plus a bonus for extra stops or helping other drivers, Doc. 98-36 (Harper Dep. at 23, 69-71, 76-77).

- SOP Enterprises Incorporated paid extra per week during some busier times. Doc. 98-10 (Barrett Dep. at 117).

Because drivers do not appear to have first-hand knowledge about how much other drivers worked and how they were paid, and because Defendant has provided evidence that hours worked and manner paid varies from ISP to ISP and from driver to driver, the present record appears to demonstrate that using a sample of "driver testimony" to identify class members is not reliable. To obtain first-hand knowledge about how many hours a driver worked and how that driver was paid, each driver would have to provide individual testimony. Even assuming individual interviews of all drivers would yield reliable results given that many drivers did not keep records of their hours worked, it is not administratively feasible to take testimony, subject to cross-examination by Defendant, of every driver working for an ISP in New Mexico.

To be sure, "[t]here will always be some level of inquiry required to verify that a person is a member of a class." *Byrd v. Aaron's Inc.,* 784 F.3d 154, 170 (3d Cir. 2015). As long as there is a method of proof for verifying class membership, the class will not be unascertainable just because "anyone charged with administering the fund resulting from a successful class action [will have to] ensure that [a claimant] is actually among the [members] identified" with resort to that method of proof. *Id.* For example, identifying class members by comparing claimants to an existing list of customers is not the kind of onerous individualized task that defeats class

certification. *Id.* A district court may also accept expert testimony that proposes a "reliable" screening model and which preserves the defendant's due process right to challenge the proof used to demonstrate class membership. *Carrera v. Bayer Corp.*, 727 F.3d 300, 307-08, 311 (3d Cir. 2013). But Plaintiffs here have proposed no such methods. There is no spreadsheet that provides a reliable list of drivers paid a day rate. Nor is there an expert report that provides a reliable method for identifying drivers paid a day rate.

Plaintiffs object, harkening back to *Mt. Clemens*, that a lack of reliable records should work against Defendant, not in its favor. Doc. 84 at 32. As discussed above in the Court's predominance analysis, however, whether Defendant employed the drivers is a matter in dispute that has not been resolved. The Court will not find Defendant owed an employer's duty while the question of whether Defendant was an employer remains in dispute. Because Plaintiffs cannot demonstrate that Defendant had a duty to keep employer records, their *Mt. Clemens* argument also fails at the ascertainability prong. *Cf. Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 356 (3d Cir. 2013) ("the nature or thoroughness of a defendant's recordkeeping does not alter the plaintiff's burden to" show the class is ascertainable, especially where the plaintiff had not "cited any statutory or regulatory authority obligating [the defendant] to create and maintain a particular set of records").

Finally, Plaintiffs contend that Defendant controls drivers' pay. Doc. 84 at 12 ("FedEx has uniform control over the drivers' pay pursuant to standardized wage and hour audits that it conducts." (emphasis removed)). Plaintiffs reason it therefore follows that Defendant has the responsibility for identifying which drivers are paid in what ways. Defendant counters that it does not dictate how ISPs compensate their employees. Doc. 98 at 27. ("It is undisputed that service providers pay drivers without any input from FedEx Ground."). As set forth above,

Defendant presents evidence that ISP pay practices vary widely. *Supra*, at 25-26. In contesting Plaintiffs' assertions that it controls what ISPs pay drivers, Defendant would have the right to present evidence of how each ISP paid their employees and of how the practice varies from ISP to ISP. The need to examine such individualized evidence to rebut Plaintiffs' allegations would turn the process of identifying each class member into a series of "mini-trials."

In sum, the Court finds that Plaintiffs' motion did not establish predominance or the ascertainability of the class; that it was Plaintiffs' burden to affirmatively demonstrate predominance and ascertainability; that the time to do was in support of the motion requesting certification under Rule 23(b)(3); that Plaintiffs' arguments at oral argument did not cure this deficiency; that Plaintiffs have provided no evidence or detailed methodology to establish hours worked through representative evidence; that Plaintiffs have failed to show an administratively feasible methodology to identify which drivers were paid a day rate; and that Plaintiffs have not demonstrated an entitlement to *Mt. Clemens* burden-shifting. Accordingly, the Court denies Plaintiffs' motion to certify a class under Rule 23(b)(3).

## III.   Issue Certification

As an alternative to granting their motion for class certification, Plaintiffs argue that the Court should decide, on a classwide basis, whether Defendant jointly employed the ISP drivers at issue. Doc. 84 at 32-33. Rule 23(c)(4) provides that "when appropriate, an action may be brought or maintained as a class action with respect to particular issues." Certification of an issue class under Rule 23(c)(4) is appropriate if the issue class itself meets the commonality, predominance, and superiority requirements for class certification. *Black v. Occidental Petroleum Corp.*, 69 F.4th 1161, 1188 (10th Cir. 2023).

Plaintiffs' written argument on this topic consists of one page—two paragraphs—in their motion and reply each. Doc. 84 at 32-33; Doc. 100 at 11. Plaintiffs do not elaborate as to the

legal standard for certifying an issue class; precisely *how* the joint-employment question will predominate; or analyze the superiority of an issue class versus alternate methods for resolving this question. *Cf. id.* In contrast to their written argument, Plaintiffs focused much of their oral argument on the topic of issue certification.

For several reasons, the Court denies Plaintiffs' request for issue certification. First, the Court's ascertainability analysis above applies with equal force to Plaintiffs' request for issue certification.[10] That is, Plaintiffs failed to prove that the class is ascertainable through an administratively feasible methodology. Second, although some factors relevant to a vertical joint-employment test could be evaluated with common evidence, consideration of other factors would involve significant individualized evidence. Because resolution of the joint-employment issue would require the presentation of significant individualized evidence, it is not suitable for Rule 23(c)(4) certification. Third, resolving the joint-employment issue would not resolve liability and would leave numerous questions to be litigated. Therefore, proceeding under Rule 23(c)(4) is not superior to having putative class members proceed on individual bases. Because the Court's Rule 23(c)(4) ascertainability analysis is the same as its Rule 23(b)(3) ascertainability analysis, the Court does not repeat that analysis and moves directly to discussing the issue of predominance.

---

[10] Identifying drivers paid a "day rate" is as necessary for issue certification as it is for class certification. *See Black v. Occidental Petroleum Corp.*, 69 F.4th 1161, 1188 (10th Cir. 2023) ("certification of an issue class under Rule 23(c)(4) is appropriate if the issue class itself satisfies the requirements of Rules 23(a) and 23(b)"); *Harris v. Med. Transportation Mgmt., Inc.*, 77 F.4th 746, 764 (D.C. Cir. 2023) (an issue class must have "all the procedural protections" of Rule 23(b)(3), which include notice of class certification because the resolution of the issue will bind absent class members). Finally, the same public policy considerations as articulated in the Third Circuit's *Marcus* decision mandate that an issue class be ascertainable (i.e., that it have all the due process protections required for an opt-out class).

A.     Predominance

As with Plaintiffs' Rule 23(b)(3) predominance argument, their issue-certification

predominance argument is extremely cursory: "Determining th[e joint-employment] threshold

legal issue, which is necessary before litigating the NMMWA claim, for all class members in one

swoop will materially advance this litigation, and this legal question will predominate." Doc. 84

at 33. In reply, Plaintiffs add: "FedEx effectively asks this Court to collapse the Rule 23(b)

predominance analysis with the inquiry under Rule 23(c)(4), an approach that numerous courts

have rejected, as it would render Rule 23(c)(4) superfluous." Doc. 100 at 11. While it may be

true that the approaches should not be identical, binding Tenth Circuit law nonetheless requires a

predominance finding of some kind in order to certify an issue class.

In a case decided after Plaintiffs filed their opening and reply briefs, the Tenth Circuit

held that "certification of an issue class under Rule 23(c)(4) is appropriate if the issue class itself

satisfies the requirements of Rules 23(a) and 23(b)." *Black v. Occidental Petroleum Corp.*, 69

F.4th 1161, 1188 (10th Cir. 2023). That is, "the contemplated issue class must meet . . . the

predominance and superiority requirements of Rule 23(b)(3)." *Id.* "Subsumed in consideration of

whether treatment as an issue class is 'superior to other available methods for fairly and

efficiently adjudicating the controversy,' is whether resolution of the issue class will materially

advance resolution of the dispute." *Id.* (quoting Fed. R. Civ. P. 23(b)(3); other quotation marks

omitted).

This holding was not, however, treading new territory in the area of issue class

certification. The Tenth Circuit recognized that its analysis was consistent with the majority of

other circuits. *Id.* at 1187 (referring to "nearly all other circuits that have interpreted Rule

23(c)(4)" in this manner.). It noted that the Fifth Circuit was the only outlier, requiring an issue

class to predominate as to the *entire* action, but that:

> the Fifth Circuit has since indicated its retreat from this application and toward
> embracing the same perspective as the majority of circuits to have addressed the
> issue. *See In re Deepwater Horizon*, 739 F.3d 790, 816 (5th Cir. 2014)
> ("Predominance may be ensured when a district court performs a sufficiently
> rigorous analysis of the means by which common and individual issues will be
> divided and tried. In many circuits, this has been accomplished by means of
> multi-phase trials under Rule 23(c)(4), which permits district courts to limit class
> treatment to particular issues and reserve other issues for individual
> determination." (internal quotation marks omitted)); *Steering Comm. v. Exxon
> Mobil Corp.*, 461 F.3d 598, 603 (5th Cir. 2006) (noting subclasses or bifurcation
> might "remedy the obstacles preventing a finding of predominance" but plaintiffs
> had not proposed bifurcation or subclasses to the district court).

*Id.* at 1187-88 (alterations omitted). Finally, the Tenth Circuit observed that "[w]ithin this circuit,

the Districts of Colorado, Kansas, Wyoming, and Utah have all interpreted Rule 23(c)(4)

consistent with the Second, Fourth, Sixth, Seventh, and Ninth Circuits." *Id.* at 1188.

In other words, the standard the Tenth Circuit announced in *Black* already prevailed in

the district courts of this circuit and the majority of other circuits. Even the Fifth Circuit, the lone

outlier, did not hold that predominance and superiority did not need to be analyzed for an issue

class, but merely disagreed as to how to analyze them for such a class. Yet Plaintiffs' brief does

not address *any* standard, let alone the prevailing one. Because Plaintiffs failed to sufficiently

address the factors required for the Court to certify an issue, they did not carry their burden to

demonstrate this case is suited for issue certification.

Deciding exactly what to consider in deciding whether to certify an issue class is difficult

in the absence of robust briefing from both sides. For instance, how to analyze predominance of

an issue class that is *less* than a liability issue class is unclear. *Black* does not answer this

question, because *Black* involves a liability issue class, meaning resolution of the issue certified

would necessarily resolve the issue of liability.

In *Black*, the district court found that "Plaintiffs had failed to demonstrate that common

questions predominated the issue of damages," and "declined to certify the class for all purposes

31

under Rule 23(b)(3). Instead, the [district] court certified a liability issue class under Rule 23(c)(4)." *Id.* at 1186. The Tenth Circuit affirmed the finding that the two major questions for liability—market power and antitrust impact—were common issues. *Id.* at 1186 ("Where all essential elements are susceptible to common proof, the district court correctly determined that common questions would predominate the issue class."). The Tenth Circuit then affirmed the district court's finding that certifying a liability class would result in "efficiencies" because "there is no reason to burden either the courts or the parties with the requirement to file individual suits, secure costly experts, and repeatedly litigate the same elements of an antitrust liability case." *Id.*

The Tenth Circuit explained that "certifying a class to determine defendant's liability, while leaving the class members to pursue their individual damages claims, is a common example of partial certification." *Id.* (internal quotation marks omitted). "Rule 23(c)(4) advances judicial economy by allowing adjudication of issues common to the class even when the entire case does not satisfy the requirements to proceed as a class action." *Id.* at 1189. However, "certification of an issue class is not appropriate if noncommon issues are inextricably entangled with common issues such that proceeding as a limited issue class is not superior to alternative methods of adjudication." *Id.* The Tenth Circuit also cited with approval the District of Kansas's consideration of whether the noncommon issues "are too unwieldy or predominant to be handled adequately on a class action basis." *Id.* at 1188 (citing *In re Motor Fuel In re Motor Fuel Temperature Sales Pracs. Litig.*, 292 F.R.D. 652, 665 (D. Kan. 2013)).

The Tenth Circuit's approving cite to a case analyzing whether noncommon issues "are too predominant" to be handled on a class-action basis presents a difficulty for Plaintiffs here. The Court explained above that noncommon issues predominate as to liability, not just damages.

That is, before attempting to prove how much overtime drivers should be paid, Plaintiffs must first demonstrate that the drivers were paid at a day rate, worked overtime, and were not paid a premium rate for that overtime. Before getting to damages, Plaintiffs must also prove the drivers' employment is governed by New Mexico law. As Defendant points out, even assuming the joint-employment issue could be decided as a class, it would only get Plaintiffs to the starting line. Before any putative (non-named) plaintiff could recover damages, that plaintiff would have to file an individual lawsuit and then present individualized evidence in an attempt to establish liability and damages. And, because these individual lawsuits could not proceed until the joint-employment issue was decided, perhaps after a trial, Rule 32(c)(4) certification could delay resolution of these individual lawsuits. To the extent these factors must be considered in a Rule 32(c)(4) analysis, they weigh against Plaintiffs.

As the D.C. Circuit recently held, "Plaintiffs cannot effectively skirt the functional demands of the predominance requirement by seeking certification of an overly narrow issue class and then arguing that the issue (inevitably) predominates as to itself." *Harris v. Med. Transportation Mgmt., Inc*., 77 F.4th 746, 762 (D.C. Cir. 2023).

> Nor can predominance become a tautological inquiry. Instead, when certifying any issue class, the district court must explain how, within the context of the particular litigation before it, common questions predominate within a reasonably and workably segregable component of the litigation. An issue class cannot consist of a single common question that predominates as to itself. Lastly, because the baseline for predominance is the resolution of all issues within a fair and administrable trial process, courts must also address how dividing the litigation through the creation of an issue class protects all parties' interests in the full presentation of their claims and evidence.

*Id.*

Plaintiffs' issue certification argument, as presented in their brief, appears to be tautological: because the issue class comprises only the joint-employment question, then the joint-employment question predominates as to the issue class. In rejecting tautological

arguments, the D.C. Circuit did not say what non-tautological measures the trial court should use to determine predominance of an issue class. It is not clear whether "joint employment" would be a "reasonabl[e] and workabl[e] segregable component of the litigation." *Cf. id.* Nonetheless, Plaintiffs' issue certification argument appears to fall within the group of tautological arguments the D.C. Circuit criticized.

      B.      <u>Assessment Of Common Versus Individual Evidence</u>

Because the parties did not brief what predominance standard applies to an issue certification request that contemplates leaving questions of liability unresolved, the Court does not now address the precise standard required to find predominance when certifying an issue class. It suffices for the Court to find that Plaintiffs have not satisfied their burden to show that joint employment is an issue that can be decided by common evidence for all class members, regardless of whether this is characterized as a predominance issue or a commonality issue.

Plaintiffs argue that the joint-employment issue lends itself to class certification because the issue can be decided on undisputed material facts that are common to the class. They assert that the Court need only apply the law to undisputed material facts to arrive at a conclusion that will be the same for all class members. Their argument is as follows: Defendant had contracts with the various ISPs; in all material aspects, those contracts were uniform; uniform provisions in these contracts are sufficient to establish that Defendant jointly employed the drivers; therefore, no need exists to consider evidence particular to any driver or ISP.

From this premise, Plaintiffs appear to suggest the following course. First, the Court decides which joint-employment test applies in the context of the New Mexico MWA. Plaintiffs posit that this is a legal question, the answer to which will apply uniformly throughout the class. Thus, Plaintiffs argue, the Court can more efficiently and consistently resolve this question on a classwide, rather than individual, basis. Second, the Court should consider the terms of the

contracts between Defendant and the ISPs. Plaintiffs assert these terms are consistent across ISPs and are undisputed. Therefore, the Court need only apply its chosen joint-employment test to these undisputed contract terms to make a legal determination about whether Defendant is a joint employer. Because the evidence and test would be the same for all drivers, it makes sense to resolve this question once on a classwide basis rather than repeatedly as part of individual lawsuits.

Plaintiffs' approach, then, is to focus on contractual provisions common between Defendant and all the ISPs. They point out that, for all drivers, Defendant maintains scanner data, establishes uniform rules (such as those related to obtaining signatures, delivering packages, and tracking packages), mandates how packages must be delivered, and sets disqualifying criteria for drivers (such as passing controlled substances screening, having safe driving records, not having to register as a sex offender, not having a record of stealing packages, etc.). Doc. 84 at 6-11. They also point out that Defendant provides a standardized set of safety rules, maintains the right to investigate accidents, and monitors ISPs to make sure they comply with wage laws. *Id.* at 13-14. Further, Plaintiffs assert that Defendant maintains oversight of drivers' vehicles (such as ensuring that the vehicles are maintained and inspected) and controls the work drivers perform by mandating that ISPs have "Business Discussions" related to issues with drivers (like speeding violations of individual drivers). *Id.* at 14-16. Plaintiffs then argue that the Court need look no farther than these common contractual provisions to analyze the relevant factors of the appropriate joint-employment test.

Defendant does not dispute that "many base terms" of contracts with ISPs are similar.[11]

---

[11] Defendant does assert that ISPs separately negotiate how much they are paid and the maximum volume of packages they must deliver each day. Doc. 98 at 14. But these differences

Doc. 98 at 14. Relevant to a vertical joint-employment test is whether these base terms are mandates that ISPs must follow or simply options for ISPs to consider.[12] That is, when it comes time to considering whether Defendant was a vertical joint employer, the Court will ask whether Defendant controlled drivers through its control of subordinate ISPs. To decide the different question of issue certification now before the Court, however, the Court simply asks whether the question of Defendant's control can be resolved through common, rather than individualized, evidence.

Plaintiffs argue Defendant controls ISPs, and indirectly controls drivers downstream, through contractual mandates, and that this control can be demonstrated through contractual provisions that indisputably apply to all ISPs. The Court agrees with Plaintiffs that some

---

between ISPs have little bearing on factors that relate to whether Defendant is a joint employer, regardless of which party's proposed test is used.

[12] "Control" is the focus of this analysis because the theory of joint employment Plaintiffs proffer is vertical rather than horizontal. The vertical joint-employment theory on which Plaintiffs base their claims is that Defendant is a dominant joint employer that sits at the apex of a vertical structure and controls drivers through its control of subordinate ISPs. *See* Investigations Manual at 72 (vertical joint-employment test "[f]ocus[es] on the nature of the relationship between the worker and the possible joint employer"); Doc. 84 at 20-21. At its core then, Plaintiffs' joint-employment theory is one of control.

How an ISP chooses to operate within the constraints of a contract arguably would be relevant to a horizontal joint-employment theory. "The focus in most horizontal joint employment cases is the degree of association between the possible joint employers with respect to the employee." Investigations Manual at 70. Under a horizontal joint-employment analysis, "An employee has joint employers where the employee performs work which simultaneously benefits two or more employers or works for two or more employers at different times during the workweek and one of the following is present: . . . (2) One employer is acting directly or indirectly in the interest of the other employer in relation to the employee . . . ." *Id.* at 69-70. The possible joint employers here are Defendant and the ISPs. Therefore, the contractual relationship between them, including how an ISP chooses to act within the constraints of their contract, might be significant to a horizontal joint-employment inquiry. A horizontal joint-employment inquiry, however, is not currently before the Court.

contractual terms are common between Defendant and all ISPs and indisputably can be characterized as mandates: As set forth above, for instance, Defendant dictates through common contractual provisions how drivers must obtain signatures, deliver packages, and track packages. Defendant argues that such mandates do not establish joint employment. Doc. 98 at 25-26.

Such argument, however, goes to the merits of the joint-employment issue, not to whether that issue can be resolved through common evidence. Again, for purposes of Rule 23(c)(4) certification, it does not matter in whose favor these common facts tilt the balance of the joint-employment test—what is important for purposes of issue certification is whether the facts are undisputed and the same for all ISPs. *Schleicher v. Wendt*, 618 F.3d 679, 685 (7th Cir. 2010).[13] And, if the Court can decide, merely by looking at contractual terms common to all ISPs, whether Defendant exerted control over drivers through its control over ISPs, it may be more efficient to make this decision once, on a classwide basis, than making it multiple times, through individual lawsuits.

Defendant also asserts, however, that although its contracts with ISPs may have some mandatory provisions, its contractual terms generally provide ISPs the freedom to operate how they choose. Because how ISPs choose to operate varies, on its way to deciding whether

---

[13] However, in deciding whether the joint-employment issue can be decided with common evidence, the Court must consider how the common evidence bears on the relevant factors. *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1087-88 (10th Cir. 2014) ("[I]t is impractical to construct an impermeable wall that will prevent the merits from bleeding into the class certification decision to some degree. So, although class certification does not depend on the merits of the suit, evaluation of many of the questions entering into determination of class action questions is intimately involved with the merits of the claims." (cleaned up)). Thus, certification considerations and merits considerations are not completely divorced. Nonetheless, to the extent the Court considers the relevancy of common contractual provisions, it does so only to the extent such consideration bears on the question of issue class certification.

Defendant and a particular ISP operated as joint employers, Defendant asserts the Court would have to individually assess how that particular ISP chose to operate. Doc. 98 at 14-15.

As an example, Defendant notes that, "Service providers decide whether to opt into a brand promotion program, in which they agree to display FedEx Ground logos on vehicles or clothing for additional [pay]." Doc. 98 at 14. Thus, although Defendant's contracts with the ISPs share the common feature of offering a brand promotion program, whether an ISP chooses to take part in some or all brand promotion options varies. Does this variance matter? Defendant argues it does, and that the need to conduct individual assessments of each ISP's choice means the joint-employment issue cannot be decided through common evidence. Plaintiffs counter with a return to their common theme: what option an ISP chooses is not relevant to the joint-employment inquiry; what matters is that all contracts with ISPs contained this same contractual provision. Doc. 100 at 6. Regarding options such as the brand promotion program, the Court agrees with Plaintiffs. For purposes of issue class certification, what matters is not what option an ISP chose, but that all ISPs were given the same option.

This is in part because Plaintiffs have not challenged the voluntariness of an ISP's decision to participate in the brand promotion program. Consequently, if the Court were to certify the issue class, it would not have to receive individualized evidence about the voluntariness of the brand promotion program or what choice each ISP made regarding the program. True, that the brand promotion program is an option for all ISPs rather than a mandate would weigh in Defendant's favor at the merits stage—when the joint employment issue is decided.[14] Which side of the joint-employment scale a factor falls on at the merits stage,

---

[14] It may seem counterintuitive that, in deciding whether Defendant jointly employed drivers, the Court directs its focus on whether Defendant controlled drivers through its control of ISPs, rather

however, is not relevant at the class-certification stage. The immediate question before the Court is not in whose favor consideration of a common contractual provision might later tilt, but whether this assessment can be made through common, not individualized, evidence.

In contrast to options such as the brand promotion program, however, the Court agrees with Defendant that at least two significant joint-employment factors cannot be resolved without individual inquiry. The first relates to Defendant's ability to hire and fire drivers. Plaintiffs argue that under the "driver disqualification program," Defendant has authority to suspend and terminate individuals from delivering its packages and that this authority is the same for all drivers. Doc. 84 at 10-11. Specifically, Plaintiffs point out that Defendant's standardized policy lists 31 separate offenses that mandate when a driver's work for Defendant must be terminated or suspended, that Defendant has the right to investigate and decide whether a driver has committed one of these offenses, and that if Defendant concludes a driver did commit one of these offenses "then that driver is either no longer permitted to drive for FedEx or must be suspended for working as a driver for FedEx for the specific time period." *Id.*

Defendant disagrees and argues that ISPs uniformly control the hiring, disciplining, and firing of their employees. *See* Doc. 98 at 26 (employment is not established "even when the service provider exclusively services the national company's contracts"); *id.* at 27 ("FedEx Ground does not manage drivers, set driver schedules, assign vehicles, determine work schedules, hire or fire, or determine when drivers report to work."); *id.* ("Business discussions between FedEx Ground and a service provider do not provide common (or any) evidence of joint

---

than directing its focus on evidence that makes it appear drivers worked for Defendant. After all, a driver who pulls up to a house in a FedEx truck wearing a FedEx uniform certainly appears more likely to work for FedEx than a driver who pulls up to a house in an unmarked vehicle wearing regular clothes. The proper focus of a vertical joint-employment test, however, is not on what option an ISP chooses, but on whether the choice was truly voluntary.

employment"); *id.* at 28 ("Assessments of service providers' wage-and-hour compliance does not evince joint employment."); *id.* at 29 ("ensur[ing] compliance with government safety regulations is not common (or any) evidence of joint employment"). However, by providing reasons that universally apply to all ISPs to argue it is not a joint employer, Defendant feeds into Plaintiffs' argument that the Court can decide the joint-employment issue as a class, without the need to get into individualized evidence.

Nonetheless, in addition to this common evidence about the ISPs' control over the drivers, Defendant convincingly argues that extensive individualized evidence would be needed to resolve the issue of whether *Defendant* controlled the ISPs' hiring, firing, and disciplining. As Defendant points out, Plaintiff Martinez was disqualified under Defendant's driver disqualification program due to moving violations. Doc. 84 at 11; Doc. 98 at 17. Despite this, his ISP continued his employment with full pay while he was temporarily disqualified. Doc. 98-14 at 16 (Martinez Dep. at 55-56). In other words, implementation of Defendant's criteria that disqualified him from working as a delivery driver for FedEx packages did not result in the termination of his employment.

This example demonstrates that Defendant has a right, for each ISP, to challenge the accuracy of Plaintiffs' assertions. If Plaintiffs' assertions are subject to impeachment through the presentation of individual and varied facts, the joint-employment issue cannot be resolved through common evidence. For instance, different ISPs may have had different reactions to drivers who committed the same infraction as Mr. Martinez. Some ISPs might have fired the driver. Others might have suspended the driver. Others might have had the driver deliver packages for some other company. In short, contrary to Plaintiffs' argument, the extent to which Defendant controlled the termination or suspension of a driver appears to be fact dependent, not

dependent on a uniform provision in Defendant's contracts with the ISPs. Defendant, in defending against Plaintiffs' argument that the Court need not look beyond common contractual terms, has the right to present individual evidence that tends to refute Plaintiffs' interpretation of the implications of those terms. Here, Defendant's exercise of this right would involve the presentation of significant individualized evidence regarding how each ISP dealt with employees who committed various infractions that disqualified them from serving as delivery drivers for FedEx packages. The need for such individualized presentation would make proceeding as a class less efficient than proceeding through individual lawsuits.

The second significant factor for which individual inquiry is required relates to exclusivity: whether ISPs only deliver FedEx packages. Defendant presents evidence that ISPs can and do have contracts with companies other than Defendant. Evidence exists that some ISPs also delivered packages for Amazon and OnTrac. Doc. 98-12 at 5-5 (Braden Dep. at 24, 73); Doc. 98-13 at 6 (Peevy Dep. at 100). One ISP even transported horses. Doc. 98-12 at 5 (Braden Dep. at 73). Evidence of deliveries for other companies is relevant because an ISP delivering packages only for Defendant will be more economically dependent on Defendant and, by extension, so will its employees. Investigations Manual at 72 ("you should examine, as matter of economic reality, the degree of the employee's economic dependence on the possible joint employer"); *Garcia v. Am. Furniture Co.*, 1984-NMCA-090, ¶ 17, 101 N.M. 785, 789. If an ISP has a contract only with Defendant, it may not have work for an employee disqualified by Defendant; by contrast, an ISP who also delivers for Amazon may have the flexibility to put that driver to work elsewhere. Defendant has the right to present individualized evidence bearing on the degree of economic independence a driver has from Defendant. Investigations Manual at 72 ("Additional evidence relevant to the economic realities may be considered. The weight given to

each factor individually and in total depends on all of the facts and circumstances of the case.").

For Plaintiffs to prevail on their certification argument, Plaintiffs would have to demonstrate that these individual variations are immaterial or irrelevant to the joint-employment test. But, regardless of which joint employment test applies, whether a putative joint employer has the ability to terminate an employee, and the degree of economic dependence an employee has on a putative employer, are significant factors. As the Supreme Court explained in *Wal-Mart Stores, Inc. v. Dukes*, for a common contention to support class certification, "[t]hat common contention . . . must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." 564 U.S. 338, 350 (2011). Here, variations between ISPs demonstrate that the joint-employment question cannot be productively litigated in one stroke for the entire class. Because Plaintiffs do not show that joint employment can be resolved without reference to individualized, disputed issues of fact, the Court cannot find this issue is suited to issue certification.

C.   Superiority

As for superiority, little indication exists that certifying the employment issue is "superior to other available methods for fairly and efficiently adjudicating the controversy," or that resolution of this issue "will materially advance resolution of the dispute." *Black v. Occidental Petroleum Corp*., 69 F.4th 1161, 1188 (10th Cir. 2023) (internal quotation marks omitted). None of the factors the Tenth Circuit identified in *Black v. Occidental Petroleum Corp*. support issue certification here. Class certification would not resolve all class members' liability in one stroke,

would not save on "costly experts,"[15] and would not save repeated litigation of the same elements of an overtime case (it would save only one). In other words, Plaintiffs do not ask this Court to certify a liability issue class—the employment issue is only one issue of five that have to be decided to determine whether Defendant is liable to any of the class members.

"If the resolution of an issues class leaves a large number of issues requiring individual decisions, the certification may not" materially advance the disposition of the litigation as a whole. Federal Judicial Center, Manual for Complex Litigation § 21.24 (4th ed. 2004). The Court agrees with Plaintiffs that the joint-employment issue is a significant issue. Indeed, it is a threshold issue—as Defendant says, joint employment is required for Plaintiffs to even get to the starting line. Doc. 98 at 32. Once there, each driver would still have to prove their remaining case on an individual basis: how they were paid; how many hours they worked, in what state they worked; and whether their pay included premium time for each hour over 40 in a week.

Resolving the joint-employment issue on a classwide basis would also significantly delay resolution of this litigation. For this issue to be resolved on a classwide basis, the parties must conduct discovery to ascertain the putative class (Doc. 121 at 153), provide notice and an opt-out mechanism to the putative class, and litigate the joint-employment issue, to include proceeding to trial on this one issue if there are disputed facts. If Plaintiffs were to prevail, the parties could then proceed to the starting line where they could begin to litigate the remaining issues on an individual basis. This means, to recover anything, all but the two individual plaintiffs already named in this lawsuit would then have to file individual cases with individual discovery tracks, individual motions practice, and individual trials. That is, even if the joint-employment issue is

---

[15] Although Plaintiffs indicated they would seek to have an expert testify about overtime hours worked, no party has argued that resolving joint employment requires expert testimony and would therefore result in saving expert costs compared to litigating the issue for each ISP driver.

certified and resolved on a classwide basis, numerous legal and factual issues will remain to be resolved on an individual basis. Courts will have to resolve on an individual basis whether each ISP driver was paid a day rate, or worked out-of-state hours such that a choice-of-law analysis would have to be performed before determining the driver's employment is governed by New Mexico law. *See* Doc. 74 at 19-20. The courts will still have to evaluate the individual work of drivers to determine their hours per week, pay for each week, and geographic location (i.e., whether some drivers worked out-of-state during part of the day). Issue certification will not resolve the question of liability; instead, the fight over liability will have just begun once the joint-employment issue is resolved as a class. Rather than delaying resolution of legal and factual issues not addressed through issue certification until the issue certification process plays out and the certified issue is resolved, resolution of the joint-employment issue can be subsumed in the individual litigation that will already present an array of other legal and factual issues. In short, Plaintiffs have failed to demonstrate that Rule 23(c)(4) certification, which may involve a preliminary trial to be followed by individual lawsuits in which liability and damages will remain hotly contested, is superior to moving directly to litigating individual lawsuits without delay. *See Harris v. Med. Transportation Mgmt., Inc*., 77 F.4th 746, 763 (D.C. Cir. 2023) ("The superiority requirement ensures that class adjudication makes the litigation more manageable and promotes the prompt and efficient resolution of the case.").

## CONCLUSION

Plaintiffs' Motion For Class Certification, Doc. 84, is DENIED.

STEVEN C. YARBROUGH
UNITED STATES MAGISTRATE JUDGE